[Cite as *State v. Pontious*, 2026-Ohio-1367.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No.  {26}F-25-003 |
| | {26}F-25-004 |
| Appellee | {26}F-25-005 |
| | |
| v. | Trial Court No.  24 CR 163 |
| | 23 CR 136 |
| James Pontious | 24 CR 54 |
| | |
| Appellant | **DECISION AND JUDGMENT** |
| | |
| | Decided: April 14, 2026 |

* * * * *

T. Luke Jones, Fulton County Prosecuting Attorney, and
Allma-Tadema Miller, Assistant Prosecuting Attorney, for appellee.

Joseph Sobecki, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, appellant, James Pontious, appeals the June 5, 2025 judgments of the Fulton County Court of Common Pleas sentencing him to an aggregate sentence of 24 months in prison.  For the following reasons, we affirm.

**I. Background and Facts**

{¶ 2} This appeal involves three trial court cases.  In trial court case Nos. 23CR136 and 24CR054 ("case 136" and "case 54"), Pontious was sentenced for violating the terms of his community control based on his conviction in trial court case No.

24CR163 ("case 163"). The trial court sentenced him to 17 months in prison in case 136 and 24 months in prison in case 54. The court ordered Pontious to serve these sentences concurrently with each other and concurrently with Pontious's sentence in case 163.

{¶ 3} In case 163, Pontious was indicted on one count of tampering with evidence in violation of R.C. 2921.12(A)(2), a third-degree felony, for allegedly forging the Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meeting verification sheet he was required to keep as part of the terms of his community control.

{¶ 4} Pontious's case was tried to the court. The State presented the testimony of Shane Chamberlin, Pontious's probation officer, and Erica Burkholder, the coordinator of the Fulton County drug court. Pontious presented the testimony of Samantha, who was at his house the day of his arrest.

{¶ 5} Chamberlin testified that Pontious was on community control and was supervised through the Fulton County adult probation office. As part of the terms of his community control, Pontious was required to attend AA or NA meetings. To document his attendance at meetings, Chamberlin gave Pontious a dated signature sheet. On October 22, 2024, Pontious brought his signature sheet to his scheduled office appointment with Chamberlin. Chamberlin initially kept the original because of his "concern about the authenticity of those AA/NA meetings . . ." but eventually returned it to Pontious. He said that the sheet caught his attention because of the "seemingly perfect pattern of Rick's Recovery and North Adrian Street Mission" meetings. He also thought that the signatures of the chairpersons "just seem[ed] odd" to him. Because of that, Chamberlin asked Pontious some questions about the meetings and noted the answers on

a copy of the signature sheet. Specifically, he asked about the location, time, and number of people in attendance at the most recent Rick's Recovery and North Adrian Street Mission meetings. Pontious's answers "still had [Chamberlin] a little concerned about the authenticity of the meetings . . . ." Based on that, Chamberlin asked Pontious, "'Are any of these meetings forged?'" Pontious paused slightly before replying, "no." According to Chamberlin, "that pause further fueled [his] suspicion that some of these [meetings] are not authentic."

{¶ 6} Chamberlin attempted to verify the existence of the groups Pontious reported attending by asking Burkholder to reach out to her contacts to see if any of them knew about the groups. When she was unsuccessful, he concluded that the only way to verify the existence of the groups was to attend one of their meetings with Pontious.

{¶ 7} On October 23, Chamberlin went to Pontious's house around 6:45 p.m. He told Pontious that they were going to an AA meeting together. Pontious "didn't like that idea" and said that he "had things going on." Pontious never agreed to show Chamberlin where the meeting was or take Chamberlin to the meeting. At some point, Chamberlin asked if there was someone who could vouch for the meeting, and Pontious provided him with a phone number. When Chamberlin called it, he did not identify himself as a probation officer; he simply said that he was looking to attend an AA meeting. The first call was short and "[n]othing really came about that, there was no information about an AA meeting that the other person provided." Pontious did not believe Chamberlin, so Chamberlin called the number again. The second time, Chamberlin identified himself as

3.

a probation officer and said that he was calling to try to verify Pontious's attendance at an AA meeting. He got the same result, i.e., he got no information about an AA meeting.

{¶ 8} After the phone calls, Pontious "started to waiver [sic] between—ok, his description, I didn't go to the meetings but I didn't write on that sheet, somebody else wrote those meetings, but I didn't go to the meetings, but I didn't write on that sheet." Pontious's counsel objected to that answer, which the court overruled. Chamberlin then said,

> in any event, so he, he starts to waffle. And I've seen this before in situations where it's difficult to make an admission. But he starts to begin to say ok, well I didn't write on that sheet but I didn't go to those meetings. I remember reflecting upon what he shared with me then was we're almost there, but I don't think it was the complete truth. So, I continued to push a little harder and he then would take that back. That the meeting did exist. And then he started to talk to me about the definition of a group. He alleged that I didn't know what the definition of a group was.

Chamberlin kept coming back to asking Pontious to take him to the meeting, but Pontious would not do it.

{¶ 9} Eventually, Chamberlin called a sheriff's deputy to assist him because the information Pontious was giving him was not getting him to his goal of verifying the meetings and he knew that he was going to arrest Pontious and he wanted a deputy nearby when he did so. Chamberlin arrested Pontious about 30 minutes after getting to his house. As he was driving Pontious to jail, Pontious considered showing Chamberlin where the meeting was but changed his mind when he realized that he was going to jail regardless.

4.

{¶ 10} Chamberlin has never been able to verify the existence of the meetings on Chamberlin's signature sheet. He has looked for them on other clients' signature sheets but has not seen them.

{¶ 11} When the State attempted to offer the original signature sheet into evidence as Exhibit 1, Pontious objected because the State had not provided that version of the sheet in discovery. The State eventually withdrew its attempt to offer the original signature sheet into evidence; it offered only the copy with Chamberlin's notes on it as Exhibit 2.

{¶ 12} On cross-examination, Chamberlin said that the evening of October 23 was not "tumultuous."

{¶ 13} Chamberlin did not recall Pontious making any phone calls while he was at Pontious's house. However, Pontious's phone records showed that he made calls to a phone number ending in 3-0789 at 6:52 and 6:54 p.m. Chamberlin said that he called a number ending in 3-0798 at 6:53 and 6:54 p.m., which was confirmed by his phone records. Chamberlin believed that Pontious showed him the number to call on Pontious's phone.

{¶ 14} Chamberlin noted that "Mr. Pontious said he did not attend any of the meetings but he would not admit to writing or forging the meetings."

{¶ 15} Before Burkholder testified, Pontious objected to her as a witness because she was not included on the State's witness list. The witness list had "representative of Fulton County Drug Court" listed as a potential witness but did not name a specific person who might be testifying. The trial court initially decided to exclude Burkholder's

5.

testimony. But after the State pointed out that its supplemental discovery response that included the witness list stated that "Erica Burkholder will be called to testify about her efforts to verify the existence of the meetings . . . [,]" the court reconsidered its decision. It decided to allow Burkholder's testimony because she was specifically mentioned by name in the section of the supplemental discovery response that was directly above the witness list and was specifically identified as potentially being called as a witness.

{¶ 16} Burkholder testified that Chamberlin asked her to help verify the meetings on Pontious's signature sheet. She had never seen or heard of those two meetings, so she first checked an app called The Meeting Guide and a website called Toledo Area 55 that list meetings. When she could not find the meetings there, she contacted the "central office" in Toledo, which told her that neither meeting was "registered or known to exist." After that, she called two sponsors in the area to ask them generally if they knew about any meetings.

{¶ 17} On cross, Burkholder testified that she did not call any phone numbers provided by Chamberlin.

{¶ 18} After Burkholder testified, the State rested. Pontious moved for acquittal under Crim.R. 29 because the evidence showed that Chamberlin dialed a different phone number than Pontious and Chamberlin could not remember whether Pontious showed him the number or verbally gave it to him, so the evidence did not show beyond a reasonable doubt that Pontious had a purpose to corrupt an official proceeding. The State responded that Pontious knew he was at an official proceeding because he was at a probation meeting, he provided a signature sheet without any type of verifiable

6.

information on it, the different phone numbers were irrelevant because there was other evidence of attempts to verify the meetings, and the signature sheet would mislead Chamberlin into believing that Pontious was compliant with the terms of his community control. The trial court denied Pontious's motion.

{¶ 19} For his case, Pontious called Samantha. She testified that she was at Pontious's house on October 23, 2024. While she was there, a black car pulled into the driveway and "skid[ded] on the stones." A man got out of the car and Pontious walked around the side of the building toward him to talk to him. Samantha could not hear all of what they were saying, but she heard the man "saying cut the shit James, telling him to take him to some sort of meeting, and saying he was going to charge him for—him and the meeting people—for felonies with tampering and he just, he was angry and yelling at him . . . ." Another person with Samantha told her that the man was Pontious's probation officer and they were possibly talking about AA meetings. When Samantha looked back around the building, the men had their phones out and were talking about something Samantha could not make out. The man with Pontious was "angry, yelling, . . . hostile in a way[,]" while Pontious was "calm. He was trying to appease this person, . . . he was doing what he said, he was just calm."

{¶ 20} After Samantha's testimony, Pontious rested.

{¶ 21} The trial court found Pontious guilty. It sentenced him to 24 months in prison, and ordered him to serve his sentence concurrently with the sentences for the community control violations in cases 136 and 54.

7.

{¶ 22} Pontious now appeals, raising six assignments of error:

I. THE TRIAL COURT ERRED BY DENYING PONTIOUS' MOTION FOR A NEW TRIAL BECAUSE STATE'S EXHIBIT 2 IS AN INADMISSIBLE POLICE REPORT THAT SHOULD NOT HAVE BEEN ADMITTED AS A MATTER OF LAW.

II. THE TRIAL COURT ABUSED ITS DISCRETION BY PERMITTING BURKHOLDER TO TESTIFY AND THEN DENYING PONTIOUS' MOTION FOR A NEW TRIAL AS IT RELATES TO BURKHOLDER'S TESTIMONY.

III. THE TRIAL COURT ERRED BY DENYING PONTIOUS' MOTION FOR NEW TRIAL BASED ON THE STATE'S FAILURE TO DISCLOSE THE ORIGINAL AA SHEET PRIOR TO ITS ATTEMPT TO INTRODUCE IT AT TRIAL.

IV. THE COURT ERRED BY DENYING THE MOTION FOR JUDGMENT OF ACQUITTAL AND LATER CONVICTING PONTIOUS BECAUSE THE STATE PRESENTED INSUFFICIENT EVIDENCE TO SUBMIT THE CASE TO THE FINDER OF FACT OR TO SUPPORT THE CONVICTION. FURTHER, THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE INSUFFICENT [sic] EVIDENCE WAS PRESENTED.

V. THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE CONVICTION.

VI. IT WAS PLAIN ERROR TO ADMIT CHAMBERLIN'S TESTIMONY OF WHAT PONTIOUS SAID BECAUSE PONTIOUS WAS NOT FREE TO LEAVE WHEN HE WAS QUESTIONED AND DID NOT RECEIVE MIRANDA WARNINGS.

## II. Law and Analysis

### A. Pontious was not entitled to a new trial based on admission of the annotated signature sheet.

{¶ 23} In his first assignment of error, Pontious argues that the trial court erred by denying his motion for a new trial because the copy of the signature sheet that the State submitted as Exhibit 2 was part of a police report, which made it inadmissible hearsay.

8.

He contends that the trial court's admission of the signature sheet is an error of law that entitles him to a new trial under Crim.R. 33(A)(5). The State responds that Pontious did not object to Exhibit 2 at trial, so he has waived all but a plain-error challenge to the exhibit on appeal. It also contends that Exhibit 2 is not part of a police report. Instead, the notes Chamberlin made on the signature sheet are Pontious's own admissions, which takes them outside of the hearsay rule.

{¶ 24} Contrary to the State's arguments, plain-error review is inappropriate because Pontious moved for a new trial. Generally, we review a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *State v. Williams*, 2025-Ohio-3105, ¶ 72 (6th Dist.), citing *State v. McNeal*, 2022-Ohio-2703, ¶ 13; and *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. Abuse of discretion means that the trial court's decision is unreasonable, arbitrary, or unconscionable. *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610 (1996). However, where the motion for a new trial involves a question of law, we review the trial court's decision de novo. *Williams* at ¶ 72, citing *McNeal* at ¶ 13.

{¶ 25} Under Crim.R. 33(A)(5), "[a] new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights: . . . [e]rror of law occurring at the trial[.]" "A new trial should not be granted unless it affirmatively appears from the record that a defendant was prejudiced by one of the grounds stated in the rule or was thereby prevented from having a fair trial." *State v. Sanders*, 2010-Ohio-3433, ¶ 18 (10th Dist.).

9.

{¶ 26} The error of law that Pontious claims is the admission of hearsay statements from a police report in the form of the signature sheet with Chamberlin's notes on it that was admitted as Exhibit 2. Based on the record before us, we cannot affirmatively say that Pontious was prejudiced or prevented from having a fair trial by an error of law.

{¶ 27} Police reports are generally inadmissible hearsay that should not be submitted to the trier of fact. *State v. Leonard*, 2004-Ohio-6235, ¶ 111. In criminal cases, Evid.R. 803(8)(b) excludes from the public-records-and-reports exception to the hearsay rule police or other law enforcement personnel reports that "recite an officer's observations of criminal activities or observations made as part of an investigation of criminal activities." *State v. Ward*, 15 Ohio St.3d 355, 358 (1984). Probation officers qualify as "law enforcement personnel." *See* R.C. 2901.01(A)(11)(b) ("'Law enforcement officer' means . . . [a]n officer, agent, or employee of the state or any of its agencies, instrumentalities, or political subdivisions, upon whom, by statute, a duty to conserve the peace or to enforce all or certain laws is imposed and the authority to arrest violators is conferred, within the limits of that statutory duty and authority[.]"); R.C. 2951.08(A) (authorizing a probation officer to arrest a person under community control sanctions).

{¶ 28} With that in mind, we agree with Pontious that it was error for the trial court to admit the portion of Exhibit 2 that contained Chamberlin's notes because those notes "recite[d Chamberlin's] . . . observations made as part of an investigation of criminal activities." *Ward* at 358. The error was harmless, however, because the notes

10.

contained Pontious's own statements, which are not hearsay under Evid.R. 801(D)(2)(a), and Chamberlin testified to the statements contained in Exhibit 2. *Leonard* at ¶ 112 ("[T]he Rules of Evidence permitted [the officer] to testify at trial as to matters contained in his investigative reports. . . . A defendant's own out-of-court statements, offered against him at trial, are not hearsay. Evid.R. 801(D)(2)(a). Thus, while the investigative reports were inadmissible hearsay, the trial court properly admitted [the officer's] in-court testimony regarding statements that Leonard had made."). Because the error was harmless, we cannot say that the trial court's error prevented Pontious from receiving a fair trial. Therefore, his first assignment of error is not well-taken.

## B. The trial court did not abuse its discretion by denying Pontious's motion for a new trial due to Burkholder testifying.

{¶ 29} In his second assignment of error, Pontious argues that the trial court abused its discretion by denying his motion for a new trial based on the court allowing Burkholder to testify at trial, despite Burkholder's name not appearing on the State's witness list. Although he concedes that "[u]ltimately, Burkholder probably should be permitted to testify[,]" Pontious maintains that the trial court abused its discretion by allowing Burkholder's testimony. He also contends that the trial court "failed to properly take prejudice to the Defense into consideration" when it denied his motion for a new trial. He claims that the late disclosure of Burkholder as a witness prevented him from having sufficient time to consider calling an expert witness to "testif[y] about what constitutes an AA meeting and if all meeting[s] are publically [sic] listed."

11.

{¶ 30} The State responds that the trial court did not abuse its discretion by denying Pontious's motion for a new trial because Burkholder was identified as a witness in the supplementary discovery response that included the witness list—albeit in a section that was not the witness list itself—and Pontious was not prejudiced by the disclosure because he knew before receiving the discovery supplement that Burkholder was likely to be called as a witness.

{¶ 31} Under Crim.R. 33(A)(1), a defendant can move for a new trial based on "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial[.]" "'A new trial may be granted under Crim. R. 33(A)(1) only when there is an irregularity, and when the record demonstrates that defendant was prejudiced thereby or denied a fair trial.'" *State v. Taylor*, 2016-Ohio-7953, ¶ 7 (9th Dist.), quoting *State v. Mason*, 1983 WL 3913, *2 (9th Dist. Nov. 9, 1983).

{¶ 32} Pontious is essentially arguing that the State's discovery violation amounted to a procedural irregularity that entitles him to a new trial. For a prosecutorial discovery violation to constitute reversible error, the defendant must make "a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995). In this context, "willful" means "'intent, purpose or design to injure.'" *State v. Litton*, 2016-Ohio-7913, ¶ 11 (12th Dist.), quoting *State v. Bowshier*, 2007-Ohio-5364, ¶ 31 (2d Dist.).

12.

{¶ 33} Here, there is no evidence that the State's failure to include Burkholder's name on its witness list (or its late disclosure of its witness list) was done willfully. That is, considering the fact that the State wrote in the discovery disclosure that included the witness list that Burkholder was expected to testify about her efforts to verify the meetings, it appears that Burkholder's omission from the witness list section of the discovery disclosure was a careless mistake, not something done with "'intent, purpose or design to injure.'" *Litton* at ¶ 11, quoting *Bowshier* at ¶ 31; *see also State v. Schulman*, 2020-Ohio-4146, ¶ 25 (no evidence of willful failure to disclose two witnesses when the State provided relevant documents in discovery and subpoenaed witnesses to testify).

{¶ 34} Because Pontious cannot show that the State willfully committed a discovery violation, we find that the trial court did not abuse its discretion by denying his motion for a new trial based on issues with Burkholder's testimony. Therefore, Pontious's second assignment of error is not well-taken.

## C. Pontious cannot show that he was prejudiced by the State's failure to disclose the original signature sheet.

{¶ 35} In his third assignment of error, Pontious argues that the trial court erred by denying his motion for a new trial based on the State's failure to disclose the original signature sheet in Exhibit 1 before trial. He contends that the State's failure to disclose the signature sheet is a procedural irregularity that entitles him to a new trial. The State responds that Pontious received Exhibit 2 in discovery and Exhibit 2 "was simply a copy of" Exhibit 1. Thus, it claims, it did not fail to disclose the original signature sheet. It also points out that Exhibit 1 was not admitted into evidence at trial.

13.

{¶ 36} First, the State is wrong in claiming that Exhibit 2 is a copy or duplicate of Exhibit 1. Exhibit 1 contains information not found on Exhibit 2 and vice versa. These documents are not the same and so cannot be considered "duplicates" of one another. *See* Evid.R. 1001(4) ("A 'duplicate' is a counterpart produced by the same impression as the original, . . . or by other equivalent techniques which accurately reproduce the original.").

{¶ 37} Next, because Pontious is again alleging a discovery violation, he must show that the State's violation was willful, that the State knew the information would have benefited the preparation of his defense, and that he suffered some prejudice. *Joseph*, 73 Ohio St.3d at 458. Even if we assume that this violation was willful, Pontious has not shown that he was prejudiced. Exhibit 1 was excluded from evidence at trial, all of the meetings on Exhibit 1 that are not on Exhibit 2 postdate the indictment, and none of the post-indictment meetings are Rick's Recovery or North Adrian Street Mission meetings. Considering that, we cannot say that Pontious was prejudiced by the State's failure to disclose Exhibit 1 before trial. Therefore, the trial court did not abuse its discretion by denying his motion for a new trial on that basis, and Pontious's third assignment of error is not well-taken.

## D. The trial court properly admitted Chamberlin's testimony about Pontious's statements.

{¶ 38} In his sixth assignment of error, Pontious argues that the trial court committed plain error by admitting Chamberlin's testimony about Pontious's statements because Pontious was in custody and Chamberlin failed to give him *Miranda* warnings. He points to Samantha's testimony that she heard someone swear at Pontious, demand

14.

that Pontious take him to a meeting, and say that he was going to charge Pontious with tampering to support his position that he was in custody "from the moment Chamberlin arrived." The State responds that Pontious was neither in custody nor deprived of his freedom in any significant way during his conversation with Chamberlin, so Chamberlin was not required to give Pontious *Miranda* warnings.

{¶ 39} "[S]tatements by an in-custody probationer to his probation officer are inadmissible in a subsequent criminal trial, where prior to questioning, the probation officer failed to advise the probationer of his *Miranda* rights as required by Section 10, Article I of the Ohio Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution." *State v. Roberts*, 32 Ohio St.3d 225, 231 (1987). For purposes of *Miranda* warnings, "custody" is defined as a formal arrest or restraint on the freedom of movement to the degree associated with a formal arrest. *State v. Mason*, 82 Ohio St.3d 144, 154 (1998). In determining if a suspect's freedom of action is restrained to the requisite degree, the relevant inquiry is whether a reasonable person in the same position would have believed that he was under arrest. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). To determine how a suspect would have assessed his freedom of movement, courts must consider all the circumstances surrounding the interrogation, including: (1) the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the suspect at the end of the questioning. *Howes v. Fields*, 565 U.S. 499, 509. Freedom of movement is not the sole determinative factor, however, and courts must consider "whether the relevant environment presents the

15.

same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

{¶ 40} Here, until he was actually arrested at the end of their conversation, Pontious's freedom of movement was not restrained to the degree associated with formal arrest during his interaction with Chamberlin. The totality of the circumstances shows that (1) Pontious and Chamberlin were outside at Pontious's home with several other people around; (2) Chamberlin told Pontious that they were going to an AA meeting together, but did not otherwise force Pontious into going to a meeting; (3) the questioning lasted about 30 minutes; (4) there is some evidence that Chamberlin swore at Pontious and was angry, but there is also some evidence that the interaction was not "tumultuous"; (5) Pontious was not physically restrained during the interaction and was allowed to access his phone; (6) Chamberlin was the only law enforcement officer around until the end of their interaction when the sheriff's deputy Chamberlin called for backup arrived; and (7) Pontious was arrested at the end of the interaction. Taking all of this into consideration, a reasonable person in Pontious's position would not have believed that he was under arrest until the sheriff's deputy arrived. Thus, Chamberlin was not required to provide Pontious with *Miranda* warnings until that point for his statements to be admissible at trial, and the trial court did not commit plain error by allowing Chamberlin to testify about Pontious's statements. Accordingly, Pontious's sixth assignment of error is not well-taken.

16.

## E. Pontious's conviction is supported by sufficient evidence.

{¶ 41} In his fourth assignment of error, Pontious argues that the trial court erred by denying his Crim.R. 29 motion, and later convicting him, because there was insufficient evidence to support his conviction. He contends that the State failed to present sufficient evidence that he presented a document with knowledge of its falsity and with purpose to mislead because Chamberlin's testimony about Pontious's statements did not make sense and "[t]he probative value of the confusing statement Chamberlin testified Pontious said is not sufficient to prove that Pontious fabricated the AA meetings when absolutely no corroborating evidence was presented." He also points out that there is evidence that Chamberlin called the wrong number when Pontious gave him a phone number to verify the existence of the AA meetings, which, he claims, is the only evidence that the State presented to show that Pontious fabricated the AA signature sheet.

{¶ 42} The State responds that Chamberlin testified about the requirements of Pontious's community control, including the requirement that Pontious attend AA or NA meetings, his suspicions about the meetings on Pontious's signature sheet, and the efforts he took to verify the existence of the meetings Pontious claimed that he attended. Burkholder also testified about the efforts she took to verify the existence of the meetings Pontious claimed that he attended. And the court had before it evidence that Pontious admitted that he did not attend the meetings on his signature sheet. Taken together, the State claims, this is sufficient evidence to prove every element of a tampering with evidence charge.

17.

{¶ 43} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 2005-Ohio-1507, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 44} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker*, 55 Ohio St.2d 208, 212 (1978).

{¶ 45} To convict Pontious of tampering with evidence, the trial court was required to find that Pontious, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, made, presented, or used any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in the proceeding or investigation, or with purpose to corrupt the outcome of the proceeding or investigation. R.C. 2921.12(A)(2). Pontious disputes only the "knowing it to be false" and "purpose to mislead" elements of the crime. A person has purpose in two scenarios: (1) when it is his specific intention to cause a certain result; and (2) when the offense prohibits certain conduct, it is his specific

18.

intention to engage in that conduct, regardless of what he intends to accomplish. R.C. 2901.22(A). A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B).

{¶ 46} Here, the evidence presented at trial showed that Pontious gave Chamberlin an AA/NA signature sheet that Chamberlin suspected contained inaccurate meeting information. When Chamberlin confronted Pontious about the sheet, "Mr. Pontious said he did not attend any of the meetings but he would not admit to writing or forging the meetings." Thus, by his own admission, Pontious knew that the information on the signature sheet was false. Although Pontious makes much of Chamberlin's "confusing" testimony on this point, Chamberlin always and only stated that Pontious said that he did not attend any of the AA meetings on the signature sheet. Whether Pontious was the person who wrote the information on the signature sheet is immaterial; what matters is whether Pontious gave Chamberlin the sheet knowing that the information on there was false. The evidence showed that he did.

{¶ 47} The evidence also showed that Pontious gave Chamberlin the signature sheet with the purpose to mislead Chamberlin. Chamberlin testified that one of the terms of Pontious's community control was attending AA or NA meetings and he was to use the signature sheet to track the meetings that he attended. The purpose of Pontious turning the signature sheet in to Chamberlin was complying with the terms of his community control, and it could only have been Pontious's specific intention to cause Chamberlin to believe that he was complying with the terms of his community control by

giving him the signature sheet.  Because that is the case, we find that Pontious's conviction is supported by sufficient evidence, and his fourth assignment of error is not well-taken.

### F. Pontious's conviction is not against the manifest weight of the evidence.

{¶ 48} Finally, in his fifth assignment of error, Pontious argues that his conviction is against the manifest weight of the evidence because Chamberlin's testimony about Pontious's statements is "self-serving, not corroborated, and not supported by any other direct evidence."  He also argues that at least part of Chamberlin's testimony is unreliable, as Chamberlin refused to admit that he dialed the wrong phone number when Pontious gave him a number to call to verify the AA meetings and denied remembering Pontious making any calls while he was with Pontious.  And he contends that Chamberlin's recollection of the evening as not tumultuous is at odds with Samantha's description of Chamberlin as "angry and yelling."  The State responds that it presented significant evidence of Pontious's guilt that was "largely uncontested, even by [Pontious's] sole witness."

{¶ 49} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trial court clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Thompkins*, 78 Ohio St.3d at 387.  We do not view the evidence in a light most favorable to the prosecution.  "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting

20.

testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), quoting *id.* Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*, 175 (1st Dist. 1983).

{¶ 50} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 51} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. We cannot say that the trial court lost its way or created a manifest miscarriage of justice by believing Chamberlin's testimony about Pontious's statements that he never went to the meetings on the signature sheet, and there was plenty of evidence that neither Chamberlin nor Burkholder could find evidence of either of the meetings on Pontious's signature sheet existing. We find, therefore, that Pontious's conviction is not against the manifest weight of the evidence. Thus, his fifth assignment of error is not well-taken.

### III. Conclusion

**{¶ 52}** For the foregoing reasons, the June 5, 2025 judgments of the Fulton County Court of Common Pleas are affirmed. Pontious is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.                                _____

JUDGE

Christine E. Mayle, J.

_____

Charles E. Sulek, J.                                    JUDGE
CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.